**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GERALDINE THOMAS** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 3686 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN,** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Geraldine Thomas ("Plaintiff" or "Thomas") seeks judicial review of a final

decision of Defendant Carolyn Colvin, the Commissioner of Social Security

("Commissioner").  The Commissioner denied Plaintiff's application for disability benefits

and supplemental security income benefits in a January 11, 2012 written decision issued

Administrative Law Judge ("ALJ") Patricia Bucci.  Thomas appealed the ruling to this Court

and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's

decision.  The Commissioner filed a cross-motion.  The Court has carefully reviewed the

relatively short administrative record but omits a detailed description of it.  The parties have

carefully outlined the record in their briefs and are thoroughly familiar with the relevant

evidence.

Applying the familiar five-step analysis, the ALJ found at Step 1 that Thomas had

not engaged in substantial gainful activity since her amended onset date of February 26,

2010.  At Step 2 she had the severe impairments of hypertension, obesity, congestive heart

failure ("CHF"), diabetes, anemia, chronic obstructive pulmonary disease ("COPD"),

gastroesophogeal reflux disease, and mild cervical degenerative disc disease.  None of these impairments were found at Step 3 to meet or medically equal a listing.  Before moving to Step 4, the ALJ determined that Plaintiff was not credible.  She assessed the RFC as light work with a number of restrictions.  The ALJ proceeded to Step 4 to conclude that Thomas could perform her past relevant work as a security guard, thereby eliminating the need to address Step 5.  As a result, the ALJ determined that Thomas was not disabled.

Thomas raises a number of concerns that do not always address the five-step analysis in an organized manner.  She essentially claims that the ALJ erred by improperly assessing her credibility and her RFC.  The Court discusses each issue in turn.

### 1.    The Credibility Issue

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work.  SSR 96-7p.  The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible.  Instead, the ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  However, an ALJ is not required to address each of these factors on an individual basis.  *Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1991).  A court reviews an ALJ's credibility decision with

deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

The ALJ found that Thomas' statements were not credible "to the extent they are inconsistent with the" RFC. (R. 23). The Commissioner's defense of this finding boils down to the following statement: "[T]he ALJ considered that Plaintiff received treatment for her neck pain and various other symptom complaints, but reasonably found that her complaints exceeded the objective findings contained in her examinations, her treatment was conservative and routine in nature, her treatment included recommendations to increase her walking and lifting exercises, none of her treating physicians found her disabled, and her activities included significant periods of part-time work as a babysitter that suggested she was exaggerating how limited she was due to her impairments." (Resp. at 9).

This summarizes the ALJ's reasons without explaining why substantial evidence supports them. The bases of the ALJ's decision are not in doubt. The relevant issue is whether, given the deference owed to a credibility assessment, the record adequately supports that decision. The government's credibility discussion does not cite any part of the record, or draw any link between the factors outlined in SSR 96-7p and the credibility assessment. Merely stating without discussion or citation that the ALJ "reasonably considered" the record is a conclusion, not an argument. In essence, the Commissioner claims that the ALJ's decision was correct, but leaves the Court to fend for itself in figuring out why the record supports that conclusion.

Even if that were proper, some of the Commissioner's reasons are clearly incorrect. The ALJ found that Thomas had worked as a babysitter in 2010 and used that fact as a ground for discrediting her. That was erroneous because the ALJ failed to account for what

Thomas actually said about this work. The babysitting work was minimal. It only involved caring for her grandchildren in Thomas' own home. The ALJ herself found that it was below the level of substantial gainful activity. Plaintiff also told the ALJ that she had stopped working as a babysitter in February 2010. (R. 49-51). This means that her work was carried out *before* Thomas' amended onset date of February 26, 2010. The ALJ never explained why minimal work performed before Thomas even claimed that she became disabled was a basis for finding that she exaggerated the difficulties of her condition after she stopped working. It goes without saying that the fact that Plaintiff performed non-substantially gainful work prior to her alleged onset does not indicate that she can undertake substantially gainful work after that date.

The ALJ also relied on the fact that none of Thomas' physicians found that she was disabled and could not work. That, too, is an improper basis for discounting Plaintiff's credibility. The ALJ implies that, had a doctor made such a statement, she would have relied on it to bolster Thomas' credibility. In reality, the ALJ would have been required to reject or seriously discount it. ALJs routinely refuse to accept such statements by a treating physician because they involve topics strictly reserved to the Commissioner. *See Frobes v. Barnhart*, 467 F. Supp.2d 808, 819 (N.D. Ill. 2006) ("[S]tatements that Claimant suffered from disabilities and was unable to work are issues reserved to the Commissioner, and were not entitled to controlling weight.").

In addition to advocating these errors, the Commissioner fails to respond to several of Thomas' basic arguments. Plaintiff contends that the ALJ incorrectly relied on the fact that she had been noncompliant with her blood pressure medication for a period of time. This was the ALJ's first stated reason for not believing Plaintiff. (R. 23). The ALJ used

4

Thomas' non-compliance to explain why she had been hospitalized in February 2010 for CHF. She then concluded without explanation that Thomas' "noncompliance with prescribed treatment weighs against her allegation of disability." (Id.).

The ALJ had no basis for reaching such a conclusion. Thomas told the ALJ that she could not afford to buy her medication. The ALJ rejected that claim because Plaintiff had been working as a babysitter at the time of her noncompliance. But Thomas explained that she only made $300 to $400 a month. Those wages had to pay for her "rent, light, and gas" as well as medication. (R. 53). The ALJ never inquired into what any of these items cost, or how Thomas could possibly have paid for all them on her meager income. It is difficult to understand how she would have been able to do so. The ALJ was not entitled to discount Thomas' credibility without first determining whether Plaintiff could meet all of her expenses on the small amount of money she earned as a babysitter. *See* SSR 96-7p; *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("An inability to afford treatment is one reason that can provide insight into the individual's credibility."); *Eskew*, 462 Fed.Appx. at 616.

The Commissioner also fails to respond to Thomas' complaint that the ALJ did not consider her ADLs, as SSR 96-7p required her to do. *Cf. Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999) (stating that an ALJ is not obligated to discuss each factor separately). Thomas claimed that she suffered from extreme fatigue that sometimes left her too tired to chew. She wakes up during the night unable to breathe and must use 11 pillows to help her sleep. She can walk up to three blocks before needing to rest. Most of her days are spent watching television. Her chronic coughing can become so bad that she needs to

keep a garbage can by her bed to spit up mucus.[1]  (R. 50-66).  The ALJ did not consider

these claims or any of the specific limitations that Plaintiff said she had.  The ALJ also failed

to inquire at all about Thomas' ability to sit, stand, push, pull, or carry.

Several problems stem from this oversight.  Without even identifying Thomas'

alleged limitations, the ALJ never discussed what it was that she found to be noncredible

in them.  An ALJ errs by failing to explain which of a claimant's statements "are not entirely

credible or how credible or noncredible any of them are."  *Martinez v. Astrue*, 630 F.3d 693,

696 (7th Cir. 2011); *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("General findings are

insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints.").  The ALJ must have credited some aspect of

Thomas' alleged limitations because the RFC includes a range of restrictions that stem

from her severe impairments.  Without identifying the symptoms in question, however, the

ALJ did not address what part of Thomas' allegations she rejected or accepted.  *See Durr-

Irving v. Colvin*, — Fed.Appx. —, 2015 WL 367138, at *5 (7th Cir. Jan. 29, 2015).

The issue is particularly important in this case because Thomas' daughter Mary

Burrage substantiated much of Plaintiff's testimony.  Burrage stated that she spends a

great deal of time with her mother.  She confirmed aspects of Thomas' own testimony,

including allegations of fatigue, coughing, and a restricted ability to sit or walk.  The ALJ did

not take account of these statements.  Instead, she broadly rejected all of them on the

ground that, while Burrage was "sincere and obviously concerned for her mother," the

limitations she described were not supported by the objective record.  (R. 27).  Bluntly

---

[1] Several parts of the record note that Thomas suffered from chronic cough.  (R. 238, 371).

stated, the ALJ found that Burrage was "sincere" but untruthful. She gave no explanation for such contradictory reasoning. The ALJ's only recourse was to point in non-specific terms to "the objective record." However, subjective statements cannot be disregarded "merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *Lapeirre-Gutt v. Astrue*, 382 Fed.Appx. 662, 664 (9th Cir. 2010)(quoting *Lester*, 81 F.3d at 834). The government has not explained how the ALJ's reasoning, combined with the complete oversight of both witnesses' specific testimony, supports the credibility finding concerning Burrage.

The ALJ thought that Thomas was not credible because she had only received conservative treatment for her condition. That can be a legitimate reason for finding that a claimant is not entirely credible. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). The problem in this case is that Thomas has eight different impairments. That is an unusually large number in this Court's experience with disability cases. It is true that she did not have surgery or some other aggressive treatment for any individual disorder. That is not the same, however, as dismissing Thomas' entire treatment history as conservative.

In particular, the ALJ failed to account for all the medications that Plaintiff took. She only noted two of them – metformin for diabetes and carvedilol for CHF. (R. 24, 26). Thomas actually takes 15 pills a day from a range of 10 different prescription medications, including two inhalers. (R. 207). The ALJ seems to have been unaware that Thomas took nifedipine and enalapril (for high blood pressure), pantoprazole (for reflux disease), hydrocholorothiazide and furosemide (for edema related to CHF), Crestor (for cholesterol), and proventil and Qvar (for asthma and breathing problems). *Id.* Other records show that

Plaintiff also took at times beclomethasone, heparin, renitidine, pravastatin, hydralazine, Klor-Con, and glimepiride. (R. 235, 240, 322, 386, 397, 400). In addition to overlooking these, the ALJ also failed to consider that the side effects of these medications match Thomas' alleged complaints of fatigue, breathing problems, severe coughing, and swelling. SSR 96-7p obligated the ALJ to account for those potential side effects as well.

The ALJ was required to at least minimally discuss Thomas' need for this astonishing array of medications before discounting her credibility based on conservative treatment. Courts often question an ALJ's characterization of the use of prescription medication as conservative. *See Cunningham v. Colvin*, 2014 WL 6634565, at *7 (E.D. Wis. Nov. 24, 2014) (citing cases). The ALJ was not necessarily required to credit Thomas' allegations. An ALJ errs, however, when she does "not reveal why [s]he concluded that [claimant's] treatment with an array of prescription medications was conservative." *Conner v. Colvin*, 2014 WL 1976995, at *9 (N.D. Ill. May 2, 2014). The ALJ exceeded this standard by not even addressing Thomas' prescription history. Doing so could have shown the ALJ that Thomas' complaints were more credible than she thought they were. For example, the ALJ doubted Plaintiff because she was never hospitalized for her asthma. The ALJ never acknowledged that Thomas needs to use two different prescription inhalers each day for her breathing problems. (R. 55).

The ALJ also failed to identify what aggressive treatments would have been appropriate. Stating that treatment has been conservative – without more – "does not provide any insight into the severity of a given condition and may even belie the condition's seriousness." *Viverette v. Astrue*, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008) Merely characterizing treatment as "conservative" fails to consider whether options would

8

have been available and appropriate for Thomas' myriad impairments. *See Buechele v. Colvin*, 2013 WL 1200611, at *17 (N.D. Ill. March 25, 2013) (criticizing a credibility assessment because the ALJ failed to state "that more aggressive treatment was indicated for Claimant's condition"). Perhaps none existed. "A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist." *Lapeirre-Gutt*, 382 Fed.Appx. at 664

The Commissioner is on firmer ground by claiming that the ALJ correctly found that Thomas' medical treatment, combined with her complaints to her doctors, did not substantiate all of her subjective allegations. The record shows that her blood pressure was well controlled, and that her complaints of neck pain were not as severe as she claimed. Nevertheless, the Commissioner again fails to respond to all of Thomas' arguments. Plaintiff stated that she had difficulty walking, in part, because "the bottom of my feet are burning up." (R. 190). She also told her physician that she experienced "burning [and] tingling on [the] bottom of [her] feet." (R. 300). The ALJ noted that Thomas had been diagnosed with diabetes at the reconsideration stage, and that she claimed that her foot pain was increasing. However, the ALJ dismissed the seriousness of Thomas' diabetes by stating that her HgA1c level was "barely within the diabetic range." (R. 26). That failed to note that Thomas had also been diagnosed with diabetic neuropathy. (R. 289, 300-01). Peripheral neuropathy includes symptoms such as "a tingling or burning feeling," "sharp, jabbing pain," and "pain when walking." *See* http://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/basics/symptoms/con-20033336. That is, of course, what Thomas described.

The ALJ also failed to consider aspects of Thomas' allegations concerning her

breathing. Thomas described shortness of breath (dyspnea) both on exertion (platypnea) and on lying down (orthopnea). She told the ALJ that she had to sleep with 11 pillows on her bed to help her breathe when she was lying down. That was up from only three pillows earlier. (R. 58). Other parts of the record support these claims. (R. 253, 431, 434, 508). The bulk of the ALJ's discussion involved exertional-related breathing problems. She only addressed orthopnea as follows: "The claimant did complain of [it] . . . when she went for an outpatient cardiology appointment in April 2010. However, she denied any dizziness or syncope and indicated a walking tolerance of four blocks." (R. 24). She also went on to discuss Thomas' normal heart sounds and clear lungs as counter-evidence of orthopnea. The ALJ appears to have assumed that the absence of dizziness, syncope (loss of consciousness), or less restricted walking refuted Thomas' statements on the issue.

The Court is unable to follow the basis of this reasoning. The ALJ failed to explain why Thomas' ability to walk impugned her claims about breathing problems when lying down. She also did not cite any medical source for linking orthopnea to Thomas' lung sounds or heart beats. "Dyspnea has multiple pulmonary, cardiac and other causes." *The Merck Manual* 357 (18th ed. 2006). Parts of the record link Thomas' orthopnea to her CHF. (R. 327). Thomas was instructed that CHF might lead to "breathing problems at night (waking up short of breath, needing more pillows to breath [sic])." (R. 328). The ALJ did not discuss that evidence.

The ALJ also failed to explain what supported linking orthopnea to dizziness, faintness, or Thomas' lung sounds. The fact that Thomas' lungs were clear in an upright position does not mean that her claims about orthopnea were not credible. "Orthopnea is caused by pulmonary congestion during recumbency. . . . Pulmonary congestion decreases

10

when the patient assumes a more erect position." *See*
http://www.ncbi.nlm.nih.gov/books/NBK213.  That may or may not explain why Thomas'
lungs were clear on examination.  The point is that the ALJ (like the Court) had no medical
expertise to draw on to reach her conclusion.  She could not discredit Thomas without citing
medical evidence to support her reasoning.

Finally, the ALJ doubted Thomas because she requested a neck brace shortly
before her scheduled hearing.  (R. 26, "Significantly, this was the first time documented in
the record that the claimant requested a neck brace and this was only three weeks before
her scheduled hearing.").  This implies that Thomas exaggerated her symptoms or was
merely malingering.  That is puzzling because the ALJ also noted that Thomas' physician
diagnosed her with cervical osteoarthritis at the same consultation as her request.  (R.
385).  The ALJ discussed Thomas' alleged neck pain at other points, but this was the only
citation to neck arthritis that she made.  The ALJ never explained why the upcoming
hearing trumped that diagnosis as a basis for explaining Thomas' request.  Her condition
may have worsened; the objective record may or may not have supported the arthritis
diagnosis; or Thomas may have been exaggerating her symptoms.  The ALJ never stated
why she chose the last alternative.  The treatment note does not suggest that Plaintiffs'
doctor thought that she made too much of her pain.  The ALJ could not discount Thomas'
credibility on this point without addressing why the medical diagnosis of cervical arthritis
was insufficient to explain her request for a brace.  *See* SSR 96-7p (stating that an ALJ
must consider the "diagnosis, prognosis, and other medical opinions provided by treating
or examining physicians").

Plaintiff's motion is granted on the credibility issue.

11

## 2.    The RFC Issue

Thomas also argues that substantial evidence does not support the ALJ's RFC assessment.  The ALJ found that Thomas could perform light work.  Light work requires, in part, that a claimant be able to do "a good deal of walking or standing."  20 C.F.R. § 404.1567(b).  Social Security Ruling 83-10 states that this involves the capacity to walk or stand for six hours a day.  The claimant must also be able to lift up to 20, and to carry up to 10 pounds frequently.  The ALJ reached this conclusion by giving great weight to the RFC report of state-agency physician Dr. Charles Kenney.  Her only alteration to Dr. Kenney's findings was to rule out all climbing of ladders, ropes, and scaffolds based on Thomas' obesity.  The ALJ also cited the brief reconsideration report of Dr. Richard Bilinsky.

The Commissioner defends these findings by complaining that Plaintiff relies on her own subjective testimony to claim that she is more restricted than the ALJ thought.  The Commissioner's point assumes that the ALJ had valid reasons for rejecting Thomas' subjective descriptions based on her finding that Thomas was not credible.  As discussed, however, the credibility analysis was flawed.  A claimant's subjective testimony is a legitimate aspect of a RFC analysis because the RFC must be based on all of the available evidence.  *See* SSR 96-8p ("Careful consideration must be given to *any* available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.") (emphasis added).  In fact, SSR 96-8p specifically requires ALJs to consider a claimant's alleged ADLs (which the ALJ overlooked entirely).

The Commissioner places great weight on the fact that no treating physician

assessed greater restrictions than those found by the ALJ.  The government claims that this is the most important factor supporting the RFC.  (Resp. at 6).  It is true that none of Thomas' doctors restricted her ability to work less than the ALJ stated in the RFC.  But that would only be relevant if one could reasonably expect to find such assessments in the treatment notes.  The Commissioner fails to address why that is the case here.  Thomas never consulted her doctors in order to have her work-related restrictions assessed.  She only went for treatment.  Indeed, she was not even employed when she saw the doctors whose notes make up the medical record.  It would be surprising indeed for a busy physician to assess a patient's work-related limits when the patient had already stopped working and was not seeking a disability evaluation.  *See Eskew v. Astrue*, 462 Fed.Appx. 613, 616 (7th Cir. 2011) (The absence of major restrictions in [claimant's] medical records does not illuminate the question of her credibility [or RFC] – she was after all unemployed throughout the time in question.").

The ALJ relied for the most part on the reports of Dr. Kenney and Dr. Bilinsky to determine Thomas' RFC.  Both of these state-agency physicians cited an earlier consultation report issued by Dr. Rana.  Dr. Rana stated that Thomas had no difficulty in walking, standing, lifting, or carrying.  He also found that she could walk "more than fifty feet unassisted."  (R. 256).  Dr. Kenney translated this into an assessment of light work.  The Commissioner claims that Dr. Kenney correctly assessed Thomas' work capacity based on the consultation report of Dr. Rana.

Neither the ALJ nor the Commissioner has explained how Dr. Kenney concluded from Dr. Rana's report that Thomas could perform light work.  There is no obvious connection between stating that a claimant does not have any exertional difficulties (and

Dr. Rana did not assess any) and finding that she is limited to light work. If Plaintiff could lift, carry, stand, and walk "without difficulty" as Dr. Rana stated, then why was she limited at all? The government highlights the issue by claiming that "Dr. Rana found no problems with Plaintiff's back or legs, no range of motion loss in her ankles, knees, or hips, normal straight leg raising in both seated and supine positions, normal muscle strength in her legs, no difficulty walking or need for any ambulatory aid, no muscle spasms, no muscle atrophy, and normal ranges of back motion." (Resp. at p. 6).

The only specific assessment that Dr. Rana made was to say that Thomas could walk more than fifty feet. That fails to explain why she could stand to the extent that would allow her to perform light work. *See Thomas v. Colvin*, 534 Fed.Appx. 546, 551 (7th Cir. 2013) ("We have previously concluded . . . that walking for 50 feet . . . does not demonstrate an ability to stand for 6 hours.") (citing *Scott v. Astrue*, 647 F.3d 734, 740 (2011)). Without any explanation, the ALJ could just as logically have found that Thomas could do more, or even less, work.

The Commissioner does not claim that the absence of a logical explanation constitutes harmless error. Even if it does, the RFC still fails. The ALJ could not rely on Dr. Kenney's RFC because the state-agency doctor did not account for all of Thomas' medical diagnoses. The ALJ failed to note that fact. The state-agency physician issued his RFC on October 27, 2010. Thomas points out that her knee osteoarthritis was only noted in the record in December 2010; peripheral neuropathy was confirmed in March 2011. That was after Dr. Kenney's RFC. The state-agency doctor could not have considered these disorders when he assessed the RFC. The ALJ also overlooked neuropathy, as noted earlier. Thus, neither the state-agency physician nor the ALJ

explained why the "burning" and "tingling" that Thomas experienced in her feet from diabetic neuropathy did not impose greater restrictions on her ability to walk and stand.

The Commissioner tries to overcome this by claiming that the ALJ properly relied on Dr. Bilinsky's later reconsideration report. Dr. Bilinsky issued that short statement on March 11, 2011 and reconfirmed Dr. Kenney's RFC. The government claims, without citing evidence, that Dr. Bilinsky accounted for Thomas' diabetic neuropathy. The record does not clearly support that claim. Dr. Bilinsky certainly knew that Thomas had been diagnosed with diabetes after Dr. Kenney issued his finding on October 27, 2010. He stated that "a new diagnosis of diabetes [had been issued] since 8/2010." (R. 279). The problem is that the diabetes diagnosis and the neuropathy diagnosis were not made at the same time. Dr. Bilinsky's notations suggest that he had not seen the records from Stroger Hospital that included the neuropathy diagnosis.

Two medical notes are at issue. One dated March 12, 2011 states that neuropathy was "confirmed" as of March 12, 2011. Dr. Bilinsky could not have seen that note because it post-dated his report. The parties agree that the other relevant Stroger note on neuropathy dates from December 2010. (R. 300-01). Dr. Bilinsky did not identify that record, though he was not necessarily required to do so. The difficulty is that he *did* identify the other Stroger records that he reviewed. These were dated August 2, 2010 and September 14, 2010. (Id.). Other than those, Dr. Bilinsky only stated that Thomas "reports a return" to Stroger, presumably after the September 2010 visit.

The Commissioner does not explain why, if Dr. Bilinsky actually saw all of the Stroger notes, he specifically mentioned some of them but overlooked the critical notes concerning neuropathy. The Court does not find that Dr. Bilinsky did not see the

15

appropriate records. Rather, the evidence is insufficient to provide the substantial evidence necessary to affirm the ALJ's decision on this issue. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford*, 227 F.3d at 869. If the government believes that a reasonable inference can be made that Dr. Bilinsky reviewed the December 2010 notes, then it should have made that point and accounted for the problems surrounding it. The Commissioner cannot persuasively argue that Dr. Bilinsky reviewed the December 2010 records by relying only on generalized claims. Combined with the other problems related to the RFC and the flawed credibility analysis, remand is required.

### 3. Conclusion

Plaintiff Geraldine Thomas' Motion for Summary Judgment [15] is granted, and the Commissioner's Motion for Summary Judgment [27] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

ENTER:

_Daniel G. Martin_
Daniel G. Martin
United States Magistrate Judge

DATE: February 6, 2015.